MURRAY v. PAULY et al.

(Circuit Court, S. D. California. June 19, 1893.)

No. 489.

BANKS AND BANKING—CERTIFICATES OF DEPOSIT—FRAUD OF OFFICERS.
    Certain persons, who were directors both of a savings bank and of a national bank, procured money from the former on two notes made by a third person to them, and given for the payment of stock of the national

bank, issued in the name of such third person for their benefit. They represented that the savings bank would have to carry the notes but a short time, and that the national bank would take care of them. These persons were behind in their accounts with the national bank, and the savings bank allowed them to overdraw their accounts with it to a large amount, which was used in settling their accounts with the national bank. Thereafter the savings bank delivered the notes and the check to the national bank, which issued to it a certificate of deposit for an amount covering the whole amount represented by them. *Held*, that this certificate of deposit was without consideration and void, and any loss accruing to the savings bank by virtue of the transactions was due to the fraud or incompetency of its own officers.

At Law. Action by Eli H. Murray, receiver of the California Savings Bank, against the California National Bank of San Diego and Frederick N. Pauly, its receiver. Judgment for defendants.

Luce & McDonald, for plaintiff.
M. T. Allen, for defendants.

ROSS, District Judge. This is a suit by the receiver of the insolvent California Savings Bank of San Diego against the receiver of the insolvent California National Bank of San Diego, based upon a certain certificate of deposit of the last-named bank issued to the California Savings Bank for $40,000, in May, 1891, as of date April 15, 1891, and while the two institutions were in running condition. Both banks occupied the same room, though there were partitions between them. A man named Collins was president of the national bank, and vice president and general manager of the savings bank, and a man named Dare was vice president of the national bank, and one of the directors of the savings bank; and the two were also carrying on some business under the firm name of Dare & Collins. F. T. Hill was cashier of the savings bank. The evidence in the case shows that in January, 1891, there was an increase of the capital stock of the national bank, and that, on or about the 20th of that month, Dare & Collins requested one T. R. Gay, who was also a director of the national bank, to take 100 shares of the stock in his name for them, giving as a reason for the request that they were carrying too much of the stock of the bank, and to execute to them, payable at the savings bank, his note for $12,500, upon which Dare & Collins would get the money from the savings bank, and pay for the national bank stock. Gay first objected, but then consented to do so as an accommodation to Dare & Collins, and upon their representation that he would not be called upon to pay anything by reason of the transaction.

On or about the same day, Dare & Collins approached one Daniel Stone, and requested him to subscribe for and take 100 shares of the stock of the bank. He replied that he did not have any money with which to buy stock, but they said it did not make any difference about the money; that he could give them his note, and they could get the money from the savings bank. After some objection and hesitation on Stone's part, he finally consented to give his note and take the stock; Dare & Collins, however, agree-

ing, in writing, to purchase the stock from him, on 60 days' notice, at the same price, "and allow said Daniel Stone ten per cent. in dividends, or otherwise, on his money so invested." In accordance with these arrangements, Gay executed to Dare & Collins his promissory note for $12,500, payable at the savings bank. Collins annexed thereto a certificate for 100 shares of the stock of the national bank, which he caused to be issued; and Stone executed to Dare & Collins his promissory note for a like amount, also payable at the savings bank. Both notes were delivered to Collins, who took them to Hill, the cashier of the savings bank, and asked him to cash them, saying at the same time that he only wanted the savings bank to carry the notes a short time, as the national bank would take care of them. The cashier of the savings bank took the notes,—that of Gay having annexed to it the certificate for 100 shares of the national bank stock, issued in his name; and for them he gave Collins a check on the national bank, payable to itself, for the aggregate amount of them,—$25,000,—which was paid. The notes were entered in the books of the savings bank in the account headed "Loans and Discounts." Within a few days thereafter, Collins applied to the cashier of the savings bank for the Gay and Stone notes, saying that he was going north, and would negotiate them; and Hill turned them over to him, taking Collins' receipt for them. Whether Collins negotiated the notes, the record does not show, but it does not appear that either of the banks ever realized any money on them.

March 27, 1891, Dare & Collins, who had an account with the savings bank, but a small amount to their credit, drew a check on that bank, payable to the order of "S. D. C. Co. SopBk," for $15,-000. That check, referred to in the testimony of Hill as a "memorandum check," and which was largely an overdraft, was taken to the cashier of the savings bank by the cashier of the national bank, without any indorsement on it, with the statement that Collins would like the savings bank to pay it, and carry the overdraft for a few days; and accordingly the cashier of the savings bank paid this $15,000 check by a check on the national bank in favor of that bank. The amounts thus paid by the savings bank for the Gay and Stone notes and on the $15,000 check aggregated $40,-000, and in May following the cashier of the savings bank took the so-called memorandum check for $15,000, and the receipts for the Gay and Stone notes that had been delivered by Hill to Collins for negotiation, to the national bank; and upon the delivery of these papers to that bank the certificate of deposit for $40,000, upon which the present suit is based, was, by Collins' direction, issued to the savings bank by the cashier of the national bank.

The certificate of deposit so issued was issued without consideration, and is void. It is enough for the stockholders and creditors of the insolvent national bank to suffer for the rascality of Collins committed in connection with that bank. They are not legally or justly responsible for the acts of the savings bank, committed through the fraud or incompetency of its own officers. The case

shows that, at the time of the overdraft by Dare & Collins on the savings bank, Collins was behind in his account with the national bank, and that the money paid by the savings bank in honoring it went to make good that account. But the stockholders and creditors of the national bank cannot be held liable for the misplaced confidence of the savings bank in the reliability and responsibility of Dare & Collins. That bank saw proper to allow that firm to overdraw its account, and must suffer the consequences. The circumstance that one of the members of that firm was vice president of the savings bank and president of the national bank, and that the other member of it was one of the directors of the latter bank, is unimportant. The fact remains that the savings bank honored and paid their check on it, and must look to them for reimbursement of that sum.

Nor can the $25,000 paid by the savings bank for the Gay and Stone notes be legally or justly treated as a deposit by that bank of its money in the national bank. That money was paid on the strength of those notes, (Gay's having attached to it a certificate in his name for 100 shares of the stock of the national bank,) supplemented, it is true, by Collins' assurance that he only wanted the savings bank to carry the notes for a short time, and that the national bank would take care of them. But that promise of Collins did not convert the purchase of the notes by the savings bank into a deposit by that bank of its money in the national bank, for which a certificate of deposit of the latter could be legally issued.

There must be judgment for the defendants, and it is so ordered.